**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JORDAN DEMETRIE WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CIV-17-258-RAW-KEW |
| | ) | |
| LUKE PETTIGREW, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

Now before the court is Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 [Doc. 1].   Petitioner, a *pro se* prisoner in the custody of the Oklahoma Department of Corrections, is currently incarcerated at the Joseph Harp Correctional Center in Lexington, Oklahoma.  Following a jury trial, he was convicted of one count of first degree murder, after former conviction of a felony, in Muskogee County District Court Case No. CF-2014-559 and sentenced to life imprisonment without the possibility of parole.  He is attacking his conviction and sentence and sets forth five grounds for relief:

I.  The State's evidence failed to disprove Petitioner's defense of self-defense and thus fails to support his conviction and sentence for first degree murder.

II.  The trial court abused its discretion by failing to *sua sponte* give instructions on heat of passion manslaughter, manslaughter by resisting criminal attempt and second degree murder, in violation of Petitioner's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.

III.  Petitioner's rights to due process and a fair trial were violated by the improper admission of irrelevant and prejudicial character evidence in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.

IV.     Petitioner was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.

V.      The accumulation of errors deprived Petitioner of a fair trial and reliable verdict.

Respondent concedes the petition is timely and that Petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review.  [Doc. 9 at 2].[1]  The grounds for relief asserted by Petitioner herein were presented to the Oklahoma Court of Criminal Appeals (OCCA), and the OCCA affirmed Petitioner's conviction and sentence.   Petitioner has not filed an application for post-conviction relief in the state district court.  The following have been submitted for consideration in this matter:

A.      Petitioner's direct appeal brief.

B.      State's brief in Petitioner's direct appeal.

C.      Petitioner's direct appeal reply brief.

D.      OCCA opinion affirming Petitioner's judgment and sentence.

E.      State court record.

F.      Transcripts.

G.      Trial exhibits.

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[1]      This court's record citations refer to the CM/ECF page numbers in the upper right-hand corner of each document.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As a preliminary matter, Petitioner has included claims specifically based upon the Oklahoma Constitution within Grounds II, III, and IV.  Those portions of Petitioner's claims are denied.  Claims grounded in a state's constitution are not cognizable on federal habeas corpus review.  The Supreme Court has explained "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  *See also Davis v. Reynolds*, 890 F.2d 1105, 1109 n. 3 (10th Cir.1989) ("Alternative state claims, whether grounded in state statutes or the State Constitution, are not cognizable under 28 U.S.C. § 2254(a)." (citation omitted)).

## Factual Background

The OCCA set forth the facts of the case as follows:

During the evening hours of July 2, 2014, Appellant shot and killed Rachelle Hayes in Muskogee, Oklahoma.  She was found at approximately 11:00 p.m. slumped over on the porch of the residence at 328 Douglas Street.  The occupant of the residence, Desmond Lewis, drove up to the house and upon seeing the decedent's body, honked his car horn.  Thinking she was drunk, Mr. Lewis hoped she would wake up and leave.  When the decedent did not stir, he notified his landlord, Natasha Franklin.  Ms. Franklin and Mr. Lewis checked the decedent's body and did not find a pulse.  Police and medical personnel were called and arrived at approximately 11:16 p.m.  The decedent was pronounced dead.  She was wearing a t-shirt, jeans and flip-flops.  Her canvas bag was across her body.  A book was found nearby.  It was later determined that she had suffered eight bullet wounds to her chest and hands.  Five projectiles were recovered from her body.  Four .25 caliber shell casings were recovered from the scene.

After he shot the decedent, Appellant left the scene and called his cousin Jodie Simpson to pick him up.  He told Mr. Simpson and girlfriend Karla Hernandez that he had just killed a woman.  When they did not believe him, he said he was not lying and told Mr. Simpson to drive by the house on Douglas Street.  Appellant

said, "she got to be dead, because I shot her four times." When the group drove by the house, they observed the decedent slumped over on the porch. Appellant offered, "yep, she's dead. I shot her." Appellant told Mr. Simpson that he shot the decedent because she was drunk, insulted him, tried to hit him with her purse and tried to cut him with a box knife. Appellant told Ms. Hernandez he killed the decedent because as they were walking, the decedent kept "messing with him and calling him names" and she tried to hit him with a purse or a brick.

After driving around, Mr. Simpson parked at a nearby restaurant and he and Appellant got out of the car and walked to the house on Douglas Street. When Mr. Simpson and Appellant got to the porch, Appellant picked up the decedent's lifeless arm and said, "look at this, she's dead." Appellant then used the flashlight on his cell phone to look for shell casings in the yard so he could pick them up. Not finding any casings, the men left the scene and walked back to Mr. Simpson's car. Appellant told Mr. Simpson and Ms. Hernandez that "I done killed that bitch" and "that bitch is dead as a doornail." Appellant gave Mr. Simpson a .25 caliber handgun and a box of ammunition to hold for him. Mr. Simpson kept the gun and ammunition until Appellant was arrested when he took it to his grandmother's house and hid it in the closet.

During the ensuing investigation, Appellant was interviewed by police. He initially denied ever having any contact with the decedent. He subsequently admitted he shot the decedent at the house at 328 Douglas Street. Appellant explained that he was walking down the street and the decedent approached him and asked for money to buy liquor. Appellant said when he refused to give her money, the decedent insulted him and threw a bottle of Gatorade at him. Still insisting she needed a bottle of liquor, Appellant said she even offered sex in exchange for money. Appellant said he again refused. He said that about this time, a white pickup pulled up to a nearby stop sign. Appellant said the decedent told the people inside the pickup that he was crazy. He said that after the pickup drove off, he tried to calm her down but she was "trippin". He said she grabbed a brick she had in her bag and "nicked" him. Appellant said he thought she was going to beat him with the brick, so he shot her. He said that she was standing in the yard the first time he shot her and she fell back onto the porch. He said he shot her four more times. He admitted that after initially leaving the scene, he went back to see if the decedent was dead and to look for spent shells.

*Williams v. State*, No. F-2015-611, slip op. at 1-4 (Okla. Crim. App. Aug. 16, 2016) (unpublished). [Doc. 9-4 at 1-4]. The OCCA's factual findings are entitled to a presumption of correctness, unless Petitioner produces clear and convincing evidence to rebut the presumption. 28 U.S.C. § 2254(e)(1).

**Ground I:  The State's evidence failed to disprove Petitioner's defense of self-defense and thus fails to support his conviction and sentence for first degree murder.**

Petitioner did not testify at trial, but he told two witnesses and law enforcement that he shot the victim, Rachelle Hayes.  Petitioner claims he had reasonable grounds to believe that he was about to suffer great harm from the victim, and he acted in self-defense.  [Doc. 1 at 5; Doc. 1-1 at 22].  After shooting the victim, Petitioner reportedly told his friend, Karla Hernandez, that the victim "kept messing with him, calling him names," and tried to hit him with a "purse or a brick." [Doc. 10-2 at 61, 72].  Petitioner reportedly told his cousin/friend, Jodie Simpson, that the victim was drunk, had called him a "n****r," had tried to hit him with her purse, and also had a box cutter.  *Id*. at 91.  In his second interview with law enforcement, Petitioner alleged that the victim "was attacking me, I shot her in self-defense, she was trying to beat me, hit me one time with the brick," that she "was trying to kill me over my money," and that "she was attacking me with everything she had."[2]  [Doc. 1-1 at 23; DVD+R, State's Trial Exhibit 18A].  Petitioner now directs the court's attention to these statements, claiming that "[u]nder these circumstances, any reasonable person would have believed that [Petitioner] was in danger of physical force or violence and that Ms. Hayes intended to do him physical harm."  [Doc. 1-1 at 23].  And, according to Petitioner, "[n]o rational trier of fact could have determined that the State proved beyond a reasonable doubt that [Petitioner] did not have a reasonable fear of great bodily injury to himself." *Id*.

---

[2]       Petitioner was interviewed by FBI Special Agent Mike Beaver and Muskogee Police Department Officer Rob Frazier on two occasions.  On July 8, 2014, in his first interview, Petitioner claimed that he had been in a car with his mother's boyfriend on the night of the murder, that they were traveling to his grandmother's house, and that he had noticed a lady slumped over on the porch as they drove by the house on Douglas Street.  [DVD+R, State's Trial Exhibit 17A at 4:05].  He remembered seeing some type of a book or notebook near the lady and noticed she was wearing flip flops.  [State's Trial Exhibit 17A at 6:30].  He repeatedly denied any involvement with the crime.  He specifically said "I didn't do it" several times, and added "I have no reason to do that to her," and "I don't even know her."  [State's Trial Exhibit 17A at 10:50, 16:59, 18:08, 45:24, 1:01:41].  He also denied having a gun in the past 30 days.  [State's Trial Exhibit 17A at 20:49].  Authorities gathered additional evidence and Petitioner was interviewed again on July 18, 2014.  [Doc. 10-2 at 143-44].  During the second interview, Petitioner stated that he shot the victim in self-defense.  Petitioner was 19 years old at the time of his interviews.  [State's Trial Exhibit 18A at 23:34].

In response, Respondent argues that federal habeas corpus relief is not warranted because "Petitioner fails to show the OCCA's determination on this issue was either contrary to, or an unreasonable application of, controlling Supreme Court law, or an unreasonable determination of the facts in light of the evidence presented in state court." [Doc. 9 at 8-9]. Respondent reminds the court that the governing standard for evaluating sufficiency of evidence claims was set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Id*. And, though the OCCA did not expressly cite to *Jackson* in the opinion, Respondent contends the OCCA applied the *Jackson* standard to find the evidence sufficient to sustain Petitioner's conviction. *Id*. at 12. Respondent also refers to the trial transcripts and exhibits to undermine the arguments in Petitioner's Ground I:

> The record demonstrates the prosecution sufficiently proved Petitioner was guilty of first degree murder and was not acting in self-defense. The evidence at trial showed Petitioner stood over Ms. Hayes, as she was cowering down below him with her hands raised, and shot her, not four (4) times, but *eight (8) times* with a gun (Tr. Vol. III, 81-86, 92; State's Trial Exhibits 6, 34, 55). While Petitioner claimed the victim had tried to either hit him with her purse or pulled a brick or a box knife from her purse and tried to attack him, no weapons of any kind were found on or around the victim and she had none in her purse (Tr. Vol. II, 156-157; Tr. Vol. III, 46, 64-66, 74, 76). Indeed, her purse was strapped close to her body when she was killed (Tr. Vol. III, 53). Petitioner also had no injuries or blood on him the night of the attack (Tr. Vol. II, 61-62, 81).

> Additionally, Mr. and Mrs. Withers testified they saw the victim immediately before she was killed and she appeared scared of Petitioner (Tr. Vol. I, 133-135, 138-139, 149-150). They never saw the victim attacking Petitioner or even holding anything in her hands (Tr. Vol. I, 143, 160). What they did see was Petitioner walking up and down the street and deliberately coming back towards the house when the victim spoke to the Withers and tried to get a ride out of the neighborhood (Tr. Vol. I, 133-140, 149-161). When the Withers drove around the corner they saw Petitioner peering around the corner of the house at them and then, as they drove further down the road, heard what Mrs. Withers thought was gunshots (Tr. Vol. I, 138-139, 140, 143-144, 149-151). She immediately surmised Petitioner had shot the victim and said as much to her husband who thought instead that the sounds were just loud fireworks (Tr. Vol. I, 139, 160).

> What the Withers' testimony indicates is that Petitioner was stalking the very drunk and scared Ms. Hayes around the yard and he waited until the Withers were out of sight before shooting the victim eight (8) times. Whether he was offended she had asked him for money and considered her a nuisance or he had heard her call him a derogatory name to the Withers and walked back to confront the victim about her choice of words, none of that provided justification under Oklahoma law for Petitioner's deadly actions. *Jones*, 201 P.3d at 886.

The jurors heard Petitioner's explanation. They reasonably chose based on all of the evidence presented, including evidence of Petitioner bragging about the murder to his friends and showing off the victim's body to his cousin, not to believe Petitioner's claim that he was fending off some type of an attack by the victim. *See, e.g., Brown v. State*, 871 P.2d 56, 65 (Okla. Crim. App. 1994) ("Despite Appellant's claims he shot the decedent only to preserve his own life and did not intend to kill him, he did not seek help for the decedent after the shooting."). Indeed, even by Petitioner's own account, the victim never threatened him and her attempts to "attack" him, either with her purse or with a brick, or with a plastic bottle, were not successful (State's Trial Exhibit 18A). Thus, any alleged fear by Petitioner that he was about to suffer death or great bodily harm at the hands of the victim was not rational and his use of force against Ms. Hayes with a deadly weapon was unreasonable and unjustified. Under such circumstances, the jury's determination that Petitioner was guilty of first degree murder cannot be viewed as irrational and the OCCA's decision upholding the verdict cannot be considered "objectively unreasonable." *Johnson*, 132 S. Ct. at 2062.

[Doc. 9 at 15-16].

The OCCA analyzed and denied relief on Petitioner's claim as follows:

In his first proposition of error, Appellant contends the evidence was insufficient to support his conviction for first degree murder because the State failed to disprove his claim of self-defense and therefore his conviction must be reversed with instructions to dismiss.

This Court looks to the entire record to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Hancock v. State*, 2007 OK CR 9, ¶ 57, 155 P.3d 796, 811. This Court accepts all reasons, inferences and credibility choices that tend to support the verdict. *Postelle v. State*, 2011 OK CR 30, ¶ 12, 267 P.3d 114, 126; *Warner v. State*, 2006 OK CR 40, ¶ 35, 144 P.3d 838, 863. The jury is the exclusive judge of the weight and credibility of the evidence and although there may be conflicts in the evidence and different inferences drawn therefrom, this Court will not disturb the jury's verdict if there is competent evidence to support it. *Warner*, 2006 OK CR 40, ¶ 40, 144 P.3d at 863.

The Oklahoma statutes define first-degree murder as the unlawful killing of a human being with malice aforethought. 21 O.S.2011, § 701.7(A). Premeditated design sufficient to establish malice aforethought may be inferred from the fact of the killing alone, unless the facts and circumstances raise a reasonable doubt as to whether such design existed. 21 O.S.2011, § 702. The unlawful design to effect death, by which a homicide constitutes murder, may be formed instantly before committing the act by which it is carried into execution. *Williams v. State*, 1991 OK CR 28, ¶ 11, 807 P.2d 271, 274.

Self-defense is an affirmative defense which admits the elements of the charge, but offers a legal justification for conduct which would otherwise be criminal. 21 O.S.2011, § 733. *See also McHam v. State*, 2005 OK CR 28, ¶ 10, 126 P.3d 662, 667. Because the State must prove that the death was unlawful as an element of first-degree murder, the State was obligated to prove, beyond a reasonable doubt, that Appellant did not act in self-defense. *Hancock*, 2007 OK CR 9, ¶ 65, 155 P.3d at 812. The trial court gave the full complement of instructions on the defense of self-defense.

The State's evidence showed that the 48 year old decedent was on the floor of the porch, with her hands raised when she was shot eight times in the chest and hands by a person standing over her. While Appellant claimed the decedent had tried to hit him with a brick or a box knife, neither a brick nor a box knife was found anywhere near the scene. Appellant had no visible injuries or blood on him that night.

Hours[3] before she was killed, the decedent had approached a pickup stopped at a stop sign near the house where she was later found dead. She asked the occupants of the truck, Mr. and Mrs. Withers, for a ride out of the neighborhood. The Withers testified they could see Appellant standing near the back of the truck and walking past them as they talked to the decedent. They testified that the decedent seemed scared of Appellant and called him "crazy". They testified they never saw anything in the decedent's hands or the decedent acting aggressively or attacking Appellant. The Withers refused the decedent's request for a ride and drove on around the corner. Mrs. Withers looked back to see Appellant watching them drive away. A few minutes later, Mrs. Withers heard what she thought were gunshots. Her husband told her it was only fireworks.

Evidence showed that the decedent was inebriated on the day of her death. Regardless of the level of her sobriety, the evidence did not support Appellant's claim that she was the aggressor. At least twenty years older than Appellant, wearing flip-flops on her feet and unarmed, any insults or threats the decedent directed at him, did not provide the justification for his deadly actions. Mere threats do not justify the use of force against another person. *Jones v. State*, 2009 OK CR 1, ¶ 65, 201 P.3d 869, 886. The amount of force used to defend oneself may not exceed the amount of force a reasonable person, in the circumstances and from the viewpoint of the defendant, would have used to prevent bodily harm. *McHam*, 2005 OK CR 28, ¶ 10, 126 P.3d at 667. The right of self-defense cannot be invoked by an aggressor or by one who voluntarily enters into a situation armed with a deadly weapon. *Davis v. State*, 2011 OK CR 29, ¶ 95, 268 P.3d 86, 115.

---

[3]   In its response, the State directs this court's attention to the jury transcript [Doc. 10-1 at 130-138, 147-155, 160], noting that "[t]he record reflects Mr. and Mrs. Withers saw the decedent and Appellant only minutes before Appellant shot the decedent." [Doc. 9 at 11].

Here, jurors heard evidence that Appellant believed he was in fear that he was about to suffer death or great bodily injury by the decedent's use of a brick or a box knife and in response shot her eight times as she lay on the ground. The jury also heard that Appellant bragged about the murder to his family and friends and showed off the decedent's lifeless body. The jury unquestionably rejected Appellant's claim of self-defense finding his fear of harm unreasonable and unjustified. Their finding of first degree murder is supported by overwhelming evidence. It is not the province of this Court to disturb their verdict. Proposition I is denied.

*Williams*, slip op. at 4-7. [Doc. 9-4 at 4-7].

In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)), *cert. denied*, 498 U.S. 904 (1990).

Sufficiency of the evidence is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas.

*Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006) (citations omitted), *cert. denied*, 549 U.S. 1285 (2007).

In federal habeas proceedings, where a sufficiency challenge was resolved on the merits by the state courts, we have held that AEDPA "adds an additional degree of deference," and the question becomes whether "the OCCA's conclusion that the

evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Diestel v. Hines,* 506 F.3d 1249, 1267 (10th Cir.2007) (quoting *Patton v. Mullin,* 425 F.3d 788, 796 (10th Cir.2005)) (internal quotation marks omitted); *see Coleman v. Johnson,* —— U.S. ——, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012) (per curiam). We call this standard of review "deference squared." *Young v. Sirmons,* 486 F.3d 655, 666 n. 3 (10th Cir.2007) (quoting *Torres v. Lytle,* 461 F.3d 1303, 1313 (10th Cir.2006)) (internal quotation marks omitted).

*Hooks v. Workman,* 689 F.3d 1148, 1166 (10th Cir. 2012).

"Even if a state court resolves a claim in a summary fashion with little or no reasoning, [the habeas court] owe[s] deference to the state court's result." *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003). A state court's summary disposition must be upheld unless a federal habeas court is persuaded, after conducting an independent review of the record and pertinent federal law, that the state court's result "unreasonably applies clearly established federal law." *Id.* (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). Oklahoma's first degree murder statute provides that:

A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Okla. Stat. tit. 21, § 701.7(A).

In the case at hand, the jury received numerous instructions at trial, including the following:

GENERAL CLOSING CHARGE – PRESUMPTION OF INNOCENCE

The defendant is presumed innocent of the crime charged, and the presumption continues unless, after consideration of all the evidence, you are convinced of his guilt beyond a reasonable doubt. The State has the burden of presenting the evidence that establishes guilt beyond a reasonable doubt.

The defendant must be found not guilty unless the State produces evidence which convinces you beyond a reasonable doubt of each element of the crime.

OUJI-CR 10-4

[Doc. 10-6 at 62].

## DIRECT AND CIRCUMSTANTIAL EVIDENCE - WEIGHT

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  You would consider circumstantial evidence together with all the other evidence in the case in arriving at your verdict.

OUJI-CR 9-4

[Doc. 10-6 at 71].

## CIRCUMSTANTIAL EVIDENCE

The State relies in part for a conviction upon circumstantial evidence.  In order to warrant conviction of a crime upon circumstantial evidence, each fact necessary to prove the guilt of the defendant must be established by the evidence beyond a reasonable doubt.  All of the facts and circumstances, taken together, must establish to your satisfaction the guilt of the defendant beyond a reasonable doubt.

OUJI-CR 9-5

[Doc. 10-6 at 72].

## HOMICIDE - INTRODUCTION

The defendant is charged with murder in the first degree of Rachelle Louise Hayes on July 2, 2014 in Muskogee County, Oklahoma.

OUJI-CR 4-59

[Doc. 10-6 at 77].

## MURDER IN THE FIRST DEGREE

## WITH MALICE AFORETHOUGHT - ELEMENTS

No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:

First, the death of a human;

Second, the death was unlawful;

Third, the death was caused by the defendant;

Fourth, the death was caused with malice aforethought.

OUJI-CR 4-61

[Doc. 10-6 at 78].

## MURDER IN THE FIRST DEGREE

### DEFINITION AND EXPLANATION OF MALICE AFORETHOUGHT

"Malice aforethought" means a deliberate intention to take away the life of a human being.  As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will.  The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed.  No particular length of time is required for formation of this deliberate intent.  The intent may have been formed instantly before commission of the act.

OUJI-CR 4-62

[Doc. 10-6 at 79].

Other important jury instructions, such as OUJI-CR 8-46 and OUJI-CR 8-49, were also provided to the jury.  Self-defense is described in OUJI-CR 8-46 as follows:

A person is justified in using deadly force in self-defense if that person reasonably believed that use of deadly force was necessary to protect himself from imminent danger of death or great bodily harm.  Self-defense is a defense although the danger to life or personal security may not have been real, if a reasonable person, in the circumstances and from the viewpoint of the defendant, would reasonably have believed that he/she was in imminent danger of death or great bodily harm.

[Doc. 10-6 at 82].

Moreover, and of significant importance, OUJI-CR 8-49 explained "[i]t is the burden of the State to prove beyond a reasonable doubt that the defendant was not acting in self-defense.  If you find that the State has failed to sustain that burden, then the defendant must be found not guilty."  [Doc. 10-6 at 83].

Another instruction provided to the jury, OUJI-CR 10-8, stated in part that "[i]t is your responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness."  [Doc. 10-6 at 66].  The instruction also stated that "[y]ou should not let sympathy, sentiment or prejudice enter into your deliberations, but should discharge your duties as jurors impartially, conscientiously, and faithfully under your oaths and return such verdict as the evidence warrants when measured by these instructions."[4]  *Id.*

Petitioner's friend and Petitioner's cousin/friend testified about statements made by Petitioner.  Petitioner now points to these statements, as well as those made during his second interview with investigators, arguing that any reasonable person would have believed that he was in danger of physical force or violence, that Ms. Hayes intended to do physical harm, and that the evidence was insufficient to support a conviction for murder in the first degree because the State failed to disprove his claim of self-defense.  The jury, however, was properly instructed on the elements of murder in the first degree and self-defense, and the credibility of the statements was a matter for the jury to consider.[5]

Petitioner raised the claims asserted in Ground I on direct appeal to the OCCA.  The OCCA explained that it "looks to the entire record to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt."  [Doc. 9-4 at 4].  The OCCA, in other words, applied a standard that is practically indistinguishable from the standard in *Jackson*, and the OCCA's decision to deny relief on the claim is not unreasonable.[6]

The jury heard evidence that on July 2, 2014, a couple ("the Withers") and their grandson were traveling through a Muskogee neighborhood after leaving a nearby Burger King.  [Doc. 10-

---

[4]    "A jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

[5]    The Tenth Circuit has repeatedly held that "the credibility of witnesses is a matter for the jury in each case to consider after proper instructions from the trial judge."  *Haskins v. United States*, 433 F.2d 836, 839 (10th Cir. 1970).

[6]    "That the OCCA did not cite *Jackson* is of no moment; state courts need not refer to, or even be aware of, controlling Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'"  *Matthews v. Workman*, 577 F.3d 1175, 1183 n.2 (10th Cir. 2009) (quoting *Early v. Packer,* 537 U.S. 3, 8 (2002)).

1 at 130-32]. The Withers stopped at an intersection, and the victim requested a ride. *Id*. at 132. Mr. Withers testified that the victim was sitting on the porch of a house near the intersection. *Id*. at 132, 137. While the victim was communicating with the Withers, Petitioner walked by their vehicle. *Id*. at 133, 135-36. Mr. Withers testified that the victim appeared to be scared and that she made a motion with her hand near her head, indicating to Mr. Withers that Petitioner was crazy. *Id*. at 135, 137. Mr. Withers refused the victim's request for a ride. *Id*. at 133. As their vehicle was driving away, Mr. Withers looked in the rearview mirror and noticed Petitioner "come to the corner, and he was peeping around the corner." *Id*. at 140. The Withers had traveled "maybe two blocks" when the Withers heard popping sounds. *Id*. at 139. Mrs. Withers questioned whether the sounds were from gunshots or fireworks. *Id*.

Later that evening, at approximately 11 p.m., Desmond Lewis pulled up to his house and noticed "a lady slumped over on the porch." [Doc. 10-1 at 103]. Mr. Lewis was unsure why the victim was on his porch, and he "blew the horn, shined the lights, [and] yelled at her." *Id*. He then called Natasha Franklin, the landlord who lived nearby, for assistance. *Id*. Mr. Lewis drove around the corner to pick up Ms. Franklin, returned to the house, and together, Mr. Lewis and Ms. Franklin approached the victim. *Id*. at 126. Ms. Franklin testified that the victim was found on her left side and that her legs "were off of the porch." *Id*. at 127. Ms. Franklin tried to take a pulse. *Id*. at 126. The victim was rolled over, and Ms. Franklin put the victim's legs on the porch, so that her body would be flat for CPR. *Id*. at 126-27. Ms. Franklin noticed that there was no pulse and that the arms and extremities of the body were cold. *Id*. at 128. Mr. Lewis had called 911, and it was during this time that the police arrived. *Id*. at 105, 109. The evidence showed the victim was wearing jeans, a t-shirt, and flip-flops at the time of her death. [Doc. 10-4 at 5, 7]. A purse was under her arm, and a book was near her body. [Doc. 10-4 at 7, 38]. There was no evidence that the victim was armed.

The jury also heard testimony that, on the day of the shooting, Petitioner called a cousin/friend for a ride. [Doc. 10-2 at 49]. He was picked up by Jodie Simpson and Karla Hernandez, and he talked about the murder. *Id*. at 49, 51-52, 79. The vehicle was driven by the murder scene and parked at a nearby restaurant. *Id*. at 81. Ms. Hernandez stayed in the vehicle. *Id*. at 53-54. Petitioner and Mr. Simpson walked from the restaurant to the scene and Petitioner showed the body to Mr. Simpson. *Id*. at 82. Mr. Simpson testified that Petitioner picked up the

decedent's lifeless arm, said "look at this," and then dropped her arm. *Id*. Petitioner also used the flashlight on his cell phone to look for shell casings in the yard. *Id*. at 82-83. The men left the scene and walked back to the vehicle. Petitioner, Mr. Simpson, and Ms. Hernandez left in the vehicle, and according to Ms. Hernandez, was far from the scene when they heard sirens. *Id*. at 63. Ms. Hernandez commented that they must have found the body. *Id*. Petitioner responded that he didn't care, "because wasn't nobody going to find out about it." *Id*. At another point while riding in the car, Petitioner said "I done killed that bitch." *Id*. at 84. The group made their way to Mr. Simpson's house, and Petitioner asked Mr. Simpson to hold the gun for him. *Id*. at 85, 95. Mr. Simpson agreed, and Petitioner handed him the gun and a box of ammunition. *Id*. at 85-86. Mr. Simpson later stored the gun and ammunition at his grandmother's house. *Id*. at 87.

Petitioner was interviewed by investigators on July 8, 2014, and July 18, 2014. Both interviews were video recorded, and the jury watched a redacted version of both interviews. [State's Trial Exhibits 17A and 18A]. During his first interview, which took place six days after the murder, Petitioner denied any involvement with the victim's death. During his second interview, which took place 16 days after the murder, Petitioner was presented with additional evidence. Some of the evidence was factual, and some was "perceived." [Doc. 10-2 at 145]. Defendant was led to believe, for example, that he was captured on video walking "at certain times of night with other people" through parking lots, when in fact there was no video. [Doc. 10-2 at 145; State's Trial Exhibit 18A at 16:23]. Petitioner at one point inquired, "Well, you tell me . . . What's the . . . What's the plea agreement? What's the offer that they're offering me?" [State's Trial Exhibit 18A at 23:58]. Agent Beaver responded that he didn't think there was an offer. [State's Trial Exhibit 18A at 24:04]. About six minutes later, Agent Beaver reiterated that the investigators came to the interview with evidence that would result in a conviction. [State's Trial Exhibit 18A at 30:05]. Petitioner asked the investigators if they found "the brick" and "the Gatorade bottle." [State's Trial Exhibit 18A at 37:59]. He then set forth the following reasons for taking the victim's life.

Petitioner told the investigators that he was "walking to the house, and here she [the victim] comes," asking for money. [State's Trial Exhibit 18A at 41:40]. According to Petitioner, the victim said she needed a bottle, needed to get drunk. [State's Trial Exhibit 18A at 41:56]. She allegedly became hostile after he commented that "you look pretty drunk right now." [State's Trial

Exhibit 18A at 42:00]. She reportedly said "n****r, don't tell me what I am." [State's Trial Exhibit 18A at 42:05]. Petitioner claims that he kept on walking, and she allegedly picked up a Gatorade bottle and "chunks it at [him], hits [him] with it." [State's Trial Exhibit 18A at 42:12]. He told the investigators that she also offered sex in exchange for money, and he turned her down. [State's Trial Exhibit 18A at 42:28]. It was at this time, according to Petitioner, that the truck driven by the Withers approached, that she asked them for a ride, and that she told the Withers that Petitioner was crazy. [State's Trial Exhibit 18A at 42:37]. He said he was trying to get her to calm down because she was "trippin" and that he "never touched her." [State's Trial Exhibit 18A at 43:01]. At some point, she evidently showed him an Access Oklahoma EBT card and asked if he had any drugs, and when he said no, she tried to take his money from him. [State's Trial Exhibit 18A at 43:10]. Ms. Hayes allegedly pulled out a brick from her purse, started swinging it at him, and "knicked" him. [State's Trial Exhibit 18A at 43:40]. Petitioner claimed that he shot the victim because "she attacked me, I shot her in self-defense . . . she was . . . trying to beat me with it . . . she hit me one time with the brick," that she "was trying to kill me . . . over my money," and that "she was attacking me with everything she had." [Doc. 1-1 at 23; State's Trial Exhibit 18A at 44:54, 46:25, 1:08:02]. He later added that, at one point, she "chunked" the brick at him and missed, explaining that "if she wasn't drunk she would have got me with it." [State's Trial Exhibit 18A at 1:09:58]. He described the brick as "red" with "three holes," and he told the investigators that it should be in the yard, near the tree. [State's Trial Exhibit 18A at 1:10:29, 1:10:46].

The jury heard testimony that Petitioner had no visible injuries or blood on him the night that the victim was murdered, and neither a brick, nor a box knife, nor a Gatorade bottle was found at the murder scene. [Doc. 10-2 at 61-62, 81, 155-57; Doc. 10-3 at 46].

The jury also heard testimony from Dr. Joshua Lanter, a medical examiner for the State of Oklahoma. Dr. Lanter testified that the cause of death was "multiple gunshot wounds." [Doc. 10-3 at 78]. He testified about the victim's <u>eight</u> separate wounds, and the direction of travel of the bullets, identified with letters "A" through "H". *Id*. at 81, 85-86, 90-91. Dr. Lanter denied that the direction of travel of the bullets were consistent with one person standing in front of the other. *Id*. at 91. Dr. Lanter was then asked "[w]ould it be consistent with the travel of a bullet if somebody had been shot, and then laid down from the wound, and then there was - - be continued to have shots?" *Id*. at 91-92. Dr. Lanter answered in the affirmative, and further added that it was

"consistent with somebody who was either bending over or laying down, and somebody standing and firing at a direction that's downward." *Id*. at 92. The doctor also testified about the results of an alcohol test, which revealed that the victim was intoxicated at the time she was shot. *Id*. at 88-89, 93.

The OCCA found that "[t]he jury unquestionably rejected Appellant's claim of self-defense finding his fear of harm unreasonable and unjustified," and noted that "[t]heir finding of first degree murder is supported by overwhelming evidence." [Doc. 9-4 at 6-7]. This court agrees. A rational jury could have found beyond a reasonable doubt that Petitioner deliberately intended to kill Ms. Hayes and that Petitioner had not acted in self-defense.

The OCCA's determination of the claim was not contrary to, or an unreasonable application, of Supreme Court law, and its decision was not based on an unreasonable determination of the facts presented at trial. Ground I lacks merit and the court denies habeas relief.

**Ground II: The trial court abused its discretion by failing to *sua sponte* give instructions on heat of passion manslaughter, manslaughter by resisting criminal attempt and second degree murder, in violation of Petitioner's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.**

Petitioner asserts in Ground II that the trial court abused its discretion by failing to *sua sponte* give instructions on the lesser included offenses of heat-of-passion manslaughter, manslaughter by resisting criminal attempt and second degree murder in violation of his due process rights. [Doc. 1 at 8; Doc. 1-1 at 24]. Respondent claims, in part, that Petitioner is not entitled to habeas relief on this ground and directs the court's attention to *Dockins v. Hines*, 374 F.3d 935 (10th Cir. 2004). [Doc. 9 at 17-18].

In *Dockins*, the Tenth Circuit rejected an instructional-error claim and denied a COA, explaining that "[t]he Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases, and neither has this court." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004) (citing *Beck v. Alabama*, 447 U.S. 625, 638 n.14, 100 S.Ct.

2382, 65 L.Ed.2d 392 (1980)); *see also Chavez v. Kerby*, 848 F.2d 1101, 1103 (10th Cir. 1988); *Hall v. Ezell*, 499 Fed.Appx. 769, 771 (10th Cir. 2012) (unpublished); *Kalbaugh v. Martin*, 809 Fed.Appx. 481, 489-90 (10th Cir. Apr. 10, 2020) (unpublished).  Simply put, Petitioner's claim is not cognizable in a federal habeas action.  Ground II of the petition is denied.

**Ground III:  Petitioner's rights to due process and a fair trial were violated by the improper admission of irrelevant and prejudicial character evidence in violation of the Fifth and Fourteenth Amendments to the United States Constitution.**

In Ground III, Petitioner complains that "the State introduced several categories of irrelevant and prejudicial character evidence," and that "[w]hatever minimal probative value any of the evidence may have had to any issue at trial was outweighed by the danger of unfair prejudice."  [Doc. 1-1 at 38].  Petitioner's brief divides Ground III into three subparts.

First, Petitioner claims the court improperly admitted evidence of his lack of remorse.  *Id*. According to Petitioner, "the State urged the jury to find [Petitioner] guilty and to sentence him to the maximum punishment possible because he lacked remorse for the crime."  *Id*. at 39.  Petitioner claims that the "lack of remorse arguments by the prosecutor were particularly prejudicial because they were untrue."  *Id*.  He claims that, during his second interview, he "remained distraught and emotional while recounting the incident for police" and he directs the court's attention to certain statements made to the investigators (i.e., he could not believe he shot the victim and that she was dead, that the incident had been eating away at him and he could not eat or sleep, that he didn't mean for it to happen).  *Id*. at 40.  Petitioner also points to a comment from Mr. Simpson at trial, wherein the witness testified that Petitioner appeared to be "hurting" but that he tried not to show it.[7]  *Id*.  Petitioner is convinced that "the trial court erred in allowing the State to inject arbitrary factors into this case," and that his conviction and sentence "should be reversed and remanded for a new trial."  *Id*.

---

[7]      Mr. Simpson was asked if "[a]t any time did you ever see [Petitioner] express remorse for what he did?"  [Doc. 10-2 at 92].  Mr. Simpson stated "[s]omewhat, you know what I'm saying. Like, you could tell it was kind of hurting him.  But he tried not to show it."  *Id*.

Second, Petitioner contends that the trial court erred in allowing the State to admit evidence that other guns were found and seized during the investigation. *Id*. at 41. In sum, Petitioner complains that "[s]everal of the State's witnesses were called to the stand even though they had no evidence to present regarding the murder charge against [Petitioner]," and that "their testimony focused on a .22 caliber firearm and third party attempts to conceal this weapon, which was completely unrelated to Rachelle Hayes's homicide." *Id*. Petitioner also complains that the State "introduced irrelevant evidence that two nine millimeter handguns had been found during a search of [Petitioner]'s mother's home," and that "[n]one of these weapons had any link to the crime at issue." *Id*. He reminds the court that, during his second interview with investigators, he told police that he shot Ms. Hayes with a .25 caliber handgun. *Id*. at 44. Petitioner contends that the evidence should not have been admitted over defense counsel's objections, and that "the erroneous admission of this evidence was reversible error." *Id*. at 47.

In the third subpart of Ground III, Petitioner acknowledges that a redacted version of Petitioner's recorded statements to Agent Beaver and Officer Frazier [State's Trial Exhibits 17A and 18A] were introduced at trial and played for the jury. [Doc. 1-1 at 47]. Petitioner also acknowledges that the State "attempted to redact some references to other crimes and bad acts." *Id*. Nevertheless, Petitioner asserts that "the redactions were not complete, resulting in the admission of highly prejudicial evidence against [Petitioner]," and that "[t]he recordings were also full of prejudicial, irrelevant and improper commentary made by the interrogating officers." *Id*. Petitioner claims "[t]here can be no doubt the evidence substantially affected [Petitioner]'s fundamental right to be tried solely for the charges against him," and that his "conviction must be reversed and remanded for a new trial." *Id*. at 52.

In response, Respondent contends that "Petitioner fails to demonstrate that the OCCA's determination the prosecutor did not engage in misconduct was either contrary to, or an unreasonable application of, controlling Supreme Court law, or that his evidentiary claims are cognizable in this proceeding." [Doc. 9 at 29-30]. Respondent also notes that Petitioner's interviews, admitted as State's Trial Exhibits 17A and 18A, "were partially redacted to delete any mention of Petitioner's prior crimes as a juvenile and his history of violence." *Id*. at 39 n.2.

On direct appeal, the OCCA thoroughly analyzed and rejected Petitioner's claims as follows:

> In Proposition III, Appellant contends the trial court erred in admitting irrelevant and prejudicial character evidence which warrants reversal of his conviction. Specifically he asserts the court improperly admitted evidence of his alleged lack of remorse and unrelated weapons and failed to redact prejudicial other crimes and bad character evidence from his recorded statements to police.
>
> Regarding the first allegation that the trial court erred in admitting evidence of his lack of remorse, Appellant asserts a prosecutorial misconduct claim. Specifically, he complains that during closing argument in both the first and second stages, the prosecutor urged the jury to convict and return a harsh sentence because Appellant "never showed any remorse" for his crime. (Tr. 30 Vol. III, pgs. 114, 122). Appellant asserts these comments were improper as he did show remorse during his police interview and Mr. Simpson testified Appellant appeared to be "hurting" after the incident. (Tr. Vol. II, pg. 92).
>
> None of the challenged statements were met with an objection. We review claims of prosecutorial misconduct for plain error in the absence of any contemporaneous objections. *Malone*, 2013 OK CR 1, ¶ 40, 293 P.3d at 211. On claims of prosecutorial misconduct, relief will be granted only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon. *Roy v. State*, 2006 OK CR 47, ¶ 29, 152 P.3d 217, 227. We evaluate alleged prosecutorial misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. *Mitchell v. State*, 2010 OK CR 14, ¶ 97, 235 P.3d 640, 661; *Cuesta-Rodriguez v. State*, 2010 OK CR 23, ¶ 96, 241 P.3d 214, 243.
>
> Appellant relies on *Bell v. State*, 2007 OK CR 43, 172 P.3d 622 to argue that a prosecutor may never comment on a defendant's lack of remorse. In *Bell*, the defendant was convicted of first degree misdemeanor manslaughter for causing the victim's death while driving impaired. The prosecutor asked the victim's family members and police officers whether the defendant had showed any remorse at the scene or at the hospital, and whether she had gone to any family member to ask if everyone was okay. Reiterating the principle that "[r]elevant evidence is that which tends to make more or less probable a fact of consequence to the case", this Court found "an expression of remorse may be relevant in capital cases to show whether a defendant may be a continuing threat to society, but is not relevant even in the second stage of a capital case where the defendant maintains his innocence throughout the trial." 2007 OK CR 43, ¶ 8, 172 P.3d at 625. This Court found that the defendant consistently stated that she had not seen the obscured stop sign and was not guilty of a crime. The Court found the evidence showed the defendant was unaware of what had happened until she was told at the hospital, was unaware there

was more than one victim and unable to approach others at the scene because she had trouble getting out of her own vehicle.  In light of this evidence, the Court found the prosecutor's questioning irrelevant, potentially inflammatory and designed to appeal to the jurors' emotions.  *Id.*  When combined with other errors at trial, the Court found the prosecutorial misconduct warranted modification of the defendant's sentence.

The present case is clearly distinguishable from *Bell*.  Appellant admitted shooting the victim, claiming only that it was self[-]defense.  Appellant did not call police or ever report the incident to any law enforcement, instead bragging about the killing and showing off the body.  During Appellant's second interview with police, he put his head in his hands and appeared to cry.  Appellant appeared emotional in recounting the incident and said he could not believe he had shot the victim, that he could not eat or sleep and didn't mean for it to happen.  Special Agent Beaver acknowledged that Appellant had taken responsibility for the victim's death and said that his show of remorse would carry great weight with the prosecutor.

As Agent Beavers later testified, his comments were merely attempts to establish communication and trust with Appellant so he would talk about the crime.  Viewing Appellant's conduct during the recorded interview, in context of his statements, Appellant appears to be more concerned with how much time he was going to spend in jail and that he would not get to see his son grow up; not that he was sorry for the decedent's death.  The prosecutor's comments on Appellant's lack of remorse were relevant in disproving his defense as the comments tended to negate Appellant's claim that his shooting the victim was necessary and reasonable.  The evidence was relevant in proving that Appellant did not act in self-defense.  *See Hancock*, 2007 OK CR 9, ¶ 65, 155 P.3d at 812.

Both the prosecution and the defense are allowed a wide range of discussion and illustration in closing argument.  *Sanchez v. State*, 2009 OK CR 31, ¶ 71, 223 P.3d 980, 1004.  Counsel enjoy a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it.  *Id.*  The prosecutor's comments on lack of remorse in this case were relevant and therefore properly allowed.  Finding no error, we find no plain error in the comments.

*Williams*, slip op. at 13-16.  [Doc. 9-4 at 13-16].

The OCCA next rejected Petitioner's argument that the trial court erroneously allowed evidence that other guns were found and seized during the murder investigation:

Appellant next contends the trial court erred in admitting evidence of unrelated weapons.  He asserts that as he admitted he shot the victim with a .25 caliber weapon and only .25 caliber shell casings were found at the scene, evidence of any other weapons was prejudicial and not relevant.

The .25 caliber handgun and ammunition Appellant gave to Mr. Simpson immediately after the murder were admitted into evidence as State's Exhibits 11 and 12. The State also introduced evidence of three other guns seized during the investigation. Officer Frazier testified that two handguns were found at the home of Appellant's mother. He gave no details about the guns, but testified that at the time the guns were discovered, investigators did not yet know what guns may have been used in the shooting. Defense counsel raised no objection to this testimony. These two guns were not admitted into evidence and neither the State nor its witnesses testified that those two guns were used in the murder.

State's Exhibit 9 was a .22 caliber handgun admitted into evidence over defense counsel's objection. Defense counsel argued that law enforcement had determined that the gun was not used in the murder, that it was not even in Appellant's possession at the time of the murder, and that any attempts to hide the gun were not done by Appellant but by a third party. The State countered by arguing that it was relevant to Appellant's intent to secret or destroy evidence which was inconsistent with the claim of self-defense and at the time the gun was found it was not known whether it was used in the murder. Although critical of the State's use of the evidence and questioning its relevance, the trial court denied the defense objection and admitted the evidence. Tracy Mahone went on to testify that he first saw the .22 caliber handgun wrapped in a blanket and laying in a chair in the home of his mother-in-law. His mother-in-law told him she did not want the gun in her house and told Mr. Mahone to get rid of the gun. Mr. Mahone took the gun and threw it in Coody Creek. A few days after talking with police, Mr. Mahone showed the officers where he disposed of the gun and it was subsequently retrieved.

Other prosecution witnesses testified that the .22 was not involved in the homicide because it was not in Appellant's possession at the time of the homicide. Jordan Miller testified that he had purchased the .22 from Appellant two weeks before the homicide and kept it in his possession. Defense counsel's further objections to the relevance of the gun were denied.

Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.2011, § 2401. Relevant evidence need not conclusively, or even directly, establish the defendant's guilt; it is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue. *Taylor v. State*, 2011 OK CR 8, ¶ 40, 248 P.3d 362, 376. Relevancy and materiality of evidence are matters within the sound discretion of the trial court absent abuse thereof. *Id.*

Appellant would have us find that only evidence of the murder weapon, the so called "smoking gun" is relevant. However, evidence of law enforcement's efforts to determine the identity of the killer, locate a murder weapon, and establish a timeline of events was also relevant in showing a thorough investigation was conducted. Here, it was not until several days after the murder that investigators first spoke with Appellant. He told investigators that the night of the murder he

had been in a car with his mother's boyfriend on the way to his grandmother's house when they drove by the house on Douglas Street and he saw a lady slumped over the porch. Appellant was not arrested and was allowed to leave. Investigators obtained a search warrant for his grandmother's house and that was when they discovered the two guns testified to by Officer Frazier.

Appellant was arrested a few days later. Jordan Miller, also arrested at the same time, called his girlfriend, Jaelyn Smith, to tell her the police were looking for the gun Appellant used to kill the decedent. Ms. Smith thought the description sounded like the .22 Mr. Miller had purchased from Appellant before the time of the murder. Spooked by the police inquiry, Ms. Smith gave the .22 to Mr. Mahone who hid it before throwing it in the creek.

Appellant was not formally interviewed by police until July 8, one day after his arrest. He initially denied shooting the decedent but then confessed to shooting her with a .25 caliber handgun. Later that day, investigators received information that Mr. Simpson and Ms. Hernandez might have information about a .25 caliber handgun.

Evidence of various weapons emerged at trial as the State showed the progression of the investigation which culminated in charging Appellant with first degree murder. Evidence showed that while Appellant initially denied committing the crime, he had access to multiple guns and family and friends had concealed these weapons for him. Evidence regarding the disposition and concealment of the possible murder weapons helped establish a time line of Appellant's conduct and tended to negate his claim of self-defense. As the caliber of the bullets which entered the decedent's body was never determined, it was possible that a gun additional to the .25 caliber handgun was used.

Relevant evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. 12 O.S.2011, § 2403. The probative value of the evidence of the investigation was not outweighed by unfair prejudice. The trial court did not abuse its discretion in admitting evidence of the weapons.

*Williams*, slip op. at 16-20. [Doc. 9-4 at 16-20].

The OCCA also rejected Petitioner's claim that the trial court should have redacted alleged prejudicial statements during his interviews:

Finally, Appellant complains that his recorded interviews with investigators, State's Exhibits 17A and 18A, were not properly redacted to remove evidence of other crimes and bad acts and other highly prejudicial evidence. Appellant also complains the recordings were full of prejudicial, irrelevant and improper commentary and personal opinion by the interrogating officers.

Special Agent Beaver identified State's Exhibits 17A and 18A as the first and second, respectively, recorded interviews between Appellant and law enforcement. Agent Beaver testified he used his usual methods of interrogation in interviewing Appellant.  He described these methods as identifying characteristics and themes unique to the suspect, finding something that will help the suspect talk, then pursuing that theme to get the suspect to open up and talk to the officers.  Agent Beaver testified that in the first interview, Appellant denied ever having seen or spoken to the decedent.  In the second interview, officers shared information with Appellant they had about the crime in an attempt to get him to talk about the crime. He admitted to embellishing some of the evidence investigators had in an attempt to get a response from Appellant.  Beaver testified that Appellant was responsive to issues concerning family responsibility, and his family being brought into court and tormented by watching him go through a trial.  Beaver testified he purposefully used a "blame the victim" technique in an attempt to give Appellant an "excuse" for his conduct and then he sympathized with Appellant in order to keep him talking.  On cross-examination, he denied encouraging Appellant to confess.

Although no defense objection was raised at trial, Appellant now complains on appeal that the trial court should have edited out of the recorded interviews Agent Beaver's questions regarding membership in a gang, Appellant's comments about how one "earn[s] stripes" in a gang, questions regarding an altercation he had with his stepfather and an argument with his grandmother over a gun, statements that he was tormenting his family by his conduct, and Agent Beaver's comment that law enforcement had evidence which would result in Appellant's conviction.  In the absence of any contemporaneous objections, we review only for plain error. *Levering*, 2013 OK CR 19, ¶ 6, 315 P.3d at 395.

The record shows the recorded interviews were partially redacted to delete any mention of Appellant's prior crimes as a juvenile and his history of violence. Questions regarding prior altercations with family members and possible gang membership were attempts by Agent Beaver to find a topic which would elicit a response from Appellant and encourage him to talk about the crime.  Appellant said he was not an active member of a gang, although he admitted to past membership. Questions about his family prompted Appellant to voice concerns over his family's reaction to his involvement in the crime.

Appellant compares this case to *Darks v. State*, 1998 OK CR 15, ¶¶ 14-15, 954 P.2d 152, 158 and *Jackson v. State*, 2007 OK CR 24, ¶¶ 16, 19-20, 163 P.3d 596, 602 where this Court found personal observations and comments by the interviewing officers were not relevant or probative of any issue.  However, the present case is distinguishable from *Darks* and *Jackson* and consistent with *Bernay v. State*, 1999 OK CR 37, 989 P.2d 998.  In *Bernay*, we found no error in admitting evidence of law enforcement interrogation techniques.  This Court stated:

> Police use different techniques in interrogation.  A juror should know that interrogation is not testimony but is trying to illicit [sic] facts or get a party to make certain statements.  The mere fact a

detective during interrogation makes statements does not cause a reasonable juror to consider those as vouching for the credibility of a party. It is, quite frankly, a way to obtain a confession or try to obtain the truth as to what did in fact occur. This Court finds the interrogation was not misleading and did not deprive the Appellant of a fair trial. The interrogation technique was a proper one, and no error is found. *Barnett v. State*, 1993 OK CR 26, ¶ 14, 853 P.2d 226, 230.

1999 OK CR 37, ¶ 30, 989 P.2d at 1009.

Here, the majority of the material on the recorded interviews is relevant and probative of Appellant's demeanor which was evidence of his guilt or innocence. "Videotaped confessions are regularly admitted and admissible to show not only the content of the confession, but also to 'show the jury the demeanor of a person and the circumstances under which confessions are made.'" *Jackson v. State*, 2007 OK CR 24, ¶ 15, 163 P.3d 596, 601, *quoting Coddington v. State*, 2006 OK CR 34, ¶ 86, 142 P.3d 437, 459. Appellant went from denying any knowledge or involvement to admitting the killing and claiming self-defense. Evidence of his evolving accounts of what happened allowed the jury to observe his demeanor and the clarity of his recall including his subsequent actions in hiding evidence and bragging about the killing. Questions and statements by Agent Beaver were consistent and illustrative of his testimony regarding his interview techniques.

While the jury was not verbally admonished as in *Darks* and *Jackson* to disregard personal comments by the officers, the jury was instructed that they were to determine the voluntariness of Appellant's statements, and in doing so, they were to consider all the circumstances surrounding the making of the statement. The jury was also instructed that they should find a confession was corroborated by other evidence and unless they found corroboration, they must disregard the confession. (O.R. 67-68; Oklahoma Uniform Jury Instructions-Criminal (2nd 9-12 and 9-13). This Court presumes that juries follow their instructions. *Jackson*, 2007 OK CR 24, ¶ 16, 163 P.3d at 602.

Reviewing the recorded interviews in their entirety and not in a piecemeal fashion as urged by Appellant, and in context of the entire trial, particularly Agent Beaver's testimony about his interviewing techniques, the trial court did not err by failing to redact the recorded statements further. The complained of comments in this case were simply a part of the interview process. To have further redacted the recorded statements would have prevented the jury from observing the full interview process with the potential of having statements from both the defendant and the interviewing officers taken out of context. Finding no error, we find no plain error and this proposition is denied.

*Williams*, slip op. at 20-24. [Doc. 9-4 at 20-24].

In the first subpart of Ground III, Petitioner alleges that he was denied a fair trial because the prosecutor improperly commented on his lack of remorse.  In particular, he claims that the lack of remorse arguments by the prosecutor were particularly prejudicial because they were untrue.  Petitioner asserts that he appeared "extremely remorseful" while making certain statements during his second recorded interview.  [Doc. 1-1 at 39].  He also points to the statement from Mr. Simpson at trial, that Petitioner had expressed remorse and that "you could tell it was kind of hurting him[,] [b]ut he tried not to show it."  [Doc. 1-1 at 40; Doc. 10-2 at 92].  Petitioner then jumps to the conclusion that the prosecutor's comments "obviously played a central role in the jury's verdict and sentence."  [Doc. 1-1 at 40].

"Generally, improper prosecutorial remarks will not warrant federal habeas relief unless the remark 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (internal quotation marks omitted).  "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct."  *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006).

> The test for whether a defendant's trial was fundamentally unfair based on a prosecutor's comments proceeds in two steps: (1) the court first decides whether the prosecutor's comments were improper, and (2) if so, it examines their likely effect on the jury's verdict.  The court thus must weigh any improper comments against the strength of the evidence against the defendant.

*United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019) (citations omitted).

The interviews and trial transcripts have been carefully reviewed, and the court is not persuaded that the prosecutor's comments on Petitioner's lack of remorse were improper.  "A prosecutor may comment on and draw reasonable inferences from evidence presented at trial."[8]

---

[8]    The court is mindful of the state court's first jury instruction.  [Doc. 10-6 at 57].  The jury was instructed that "[i]t is the responsibility of the attorneys to present evidence, to examine and cross-examine witnesses, and to argue the evidence.  No statement or argument of the attorneys is evidence."  *Id*. at 58.  The jury was also instructed that "[a]fter the evidence is completed, I will instruct you on the law applicable to the case.  The attorneys are then permitted closing

*Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005).  Petitioner argues that he was visibly sobbing, and points to specific statements that he made during the interview, such as "I didn't mean for it to happen, I didn't mean for it to happen."  [Doc. 1-1 at 40].  Such statements were at odds with the evidence.  Petitioner watched the Withers drive away before shooting the victim.  Ms. Hayes had <u>eight</u> separate wounds, and the direction of travel of the bullets were consistent with a victim who was either bending over or laying down, and somebody standing and firing at a downward direction.  Petitioner did not seek aid for the victim.  He left the scene.  He also denied any knowledge or involvement with the victim's death during his first interview with the investigators.  The fact that Petitioner was sobbing and recounting the incident for police in his second interview does not mean that he was sorry for the victim's death.  Additional evidence was presented to Petitioner in his second interview, and Petitioner expressed concern about how much time he could get in prison and that he would miss out on his child growing up.

The same can be said about Mr. Simpson's testimony.  Mr. Simpson did not testify that Petitioner was sorry for the death of Ms. Hayes.  Mr. Simpson vaguely testified that Petitioner was "somewhat" showing remorse, that "you could tell it was kind of hurting him [,] [b]ut he tried not to show it."  [Doc. 10-2 at 92].  Keep in mind that Mr. Simpson also told the jury that, after returning to the scene to look at the body and to pick up shell casings, Petitioner said "I done killed that bitch."  *Id*. at 84.  Additionally, when Ms. Hernandez heard sirens and commented that they must have found the body, Petitioner responded that he didn't care, "because wasn't nobody going to find out about it."  *Id*. at 63.  These statements provide no indication that Petitioner was upset for shooting the victim to defend his own life.

The OCCA concluded, and this court agrees, that "[t]he prosecutor's comments on [Petitioner]'s lack of remorse were relevant in disproving his defense as the comments tended to negate Appellant's claim that his shooting the victim was necessary and reasonable," and "[t]he evidence was relevant in proving that [Petitioner] did not act in self-defense."  [Doc. 9-4 at 16].  The court is also convinced that the prosecutorial comments, even if improper, when weighed against the strength of the evidence against the defendant, did not result in a fundamentally unfair proceeding.  *See United States v. Fleming,* 667 F.3d 1098, 1106 (10th Cir. 2011) ("We need not

---

arguments.  Closing arguments are not evidence and are permitted for the purposes of persuasion only."  *Id.*

decide whether the prosecutor's comment . . . was improper, because even if it were, [the defendant] has not demonstrated that the statement violated his substantial rights.").  The alleged prosecutorial misconduct, when viewed in light of the trial as a whole, did not result in a fundamentally unfair proceeding, and the OCCA's decision on this issue was consistent with federal law.

In the second and third subparts of Ground III, Petitioner is challenging the state court's evidentiary decisions.  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  "Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights."  *Smallwood v. Gibson,* 191 F.3d 1257, 1275 (10th Cir. 1999); *see also Ochoa v. Workman*, 669 F.3d 1130, 1144 (10th Cir. 2012). State court evidentiary rulings are based on questions of state law and this court "may not provide habeas corpus relief . . . unless [those rulings] rendered the trial so fundamentally unfair that a denial of constitutional rights results."  *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotations omitted).

Petitioner argues in the second subpart of Ground III that the trial court erred in allowing the State to admit evidence that other guns were found and seized during the investigation, and that the "collateral evidence concerning these unrelated weapons was undoubtedly confusing and misleading to the jurors."  [Doc. 1-1 at 47].  The OCCA, however, thoroughly analyzed this claim and concluded that the admission of the other gun evidence was not error because it was relevant and its probative value was not substantially outweighed by unfair prejudice.  This is not unreasonable.

Ms. Hayes had eight separate wounds, and only four (4) spent shell casings were recovered from the scene.  The caliber of the bullets which entered the victim's body were never determined, and the OCCA correctly pointed out that "it was possible that a gun additional to the .25 caliber handgun" could have been used to kill the victim.  [Doc. 9-4 at 20].  The OCCA noted that Petitioner had access to multiple guns, that his family and friends had concealed these weapons for him, and that the disposition and concealment of the possible murder weapons helped establish a time line of Petitioner's conduct and tended to negate his claim of self-defense.  Under the

circumstances, the admission of the testimony regarding retrieval of the other guns was not so grossly prejudicial that it fatally infected the fairness of Petitioner's trial.

Petitioner's last claim in Ground III must also be denied.  In summary, Petitioner complains that the videos of his first and second interviews should have been further redacted to remove certain comments from FBI Agent Beaver.  He argues that "[l]arge portions of State's Exhibit 17A were highly prejudicial and had no legitimate probative value for the State," and that "there were several extremely damaging references to other crimes and bad acts which were not redacted." [Doc. 1-1 at 47].  He first complains about Agent Beaver's questions and comments about whether he was in a gang and whether he had been in an altercation with his stepfather.  *Id.* at 47-48. Petitioner also asserts that "additional other crimes and bad acts were brought out during the second interrogation," noting that Agent Beaver had asked Petitioner if he had been in an argument with his grandmother involving a gun.  *Id.* at 48.  He then complains about the agent's statements about him lying (about his involvement in the crime) and how the agent thought those lies would impact Petitioner's family.  *Id.* at 49-50.  Lastly, he argues that Agent Beaver gave an improper opinion on Mr. William's guilt.  *Id.* at 50.  Ultimately, Petitioner claims that "[e]ven if the State could argue [Petitioner]'s statements were relevant to some issue at trial, the State should have edited and excised the inflammatory portions which were mainly just commentary of Agent Beaver before showing the DVD to the jury."  *Id.*  And, according to Petitioner, "[t]he undue prejudice created by the admission of these unredacted portions of these statements containing references to other crimes and bad acts, as well as improper opinion evidence, deprived [Petitioner] of a fair trial and his conviction must be reversed."  *Id.*

The OCCA also rejected this subpart of Petitioner's Ground III, noting that "the majority of the material on the recorded interviews is relevant and probative of [Petitioner]'s demeanor which was evidence of his guilt or innocence."  [Doc. 9-4 at 22].  Once again, this is not unreasonable.  The OCCA observed that Petitioner "went from denying any knowledge or involvement to admitting the killing and claiming self-defense," and that the "[e]vidence of his evolving accounts of what happened allowed the jury to observe his demeanor and the clarity of his recall including his subsequent actions in hiding evidence and bragging about the killing."  *Id.* at 23.  Moreover, the jury heard testimony from Agent Beaver that the comments made during the interviews were simply part of his interview techniques to keep the Petitioner talking.

A federal habeas court "will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies [the petitioner] due process of law." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (citing *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998). "An inquiry into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the [Petitioner]." *Hanson v. Sherrod*, 797 F.3d 810, 843 (10th Cir. 2015). Petitioner complains about the admission of the challenged evidence, but the probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice, and the other evidence against Petitioner was overwhelming. Petitioner has not demonstrated that the admission of the challenged evidence rendered his trial fundamentally unfair, and the OCCA's adjudication of this claim was not contrary to, or an unreasonable application of, Supreme Court law. Federal habeas relief is denied on Ground III.

**Ground IV: Petitioner was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

Petitioner's ineffectiveness of counsel claim in Ground IV is based upon the claims found in Grounds II and III above. [Doc. 1 at 11; Doc. 1-1 at 53-56]. Petitioner claims his trial counsel was ineffective because he failed to request lesser offense instructions and failed to object to improper and irrelevant character evidence. *Id*. Respondent, in response, again points out that the OCCA addressed Petitioner's claim on the merits and denied relief. [Doc. 9 at 46]. Respondent contends that the OCCA's determination on this issue was neither contrary to, nor an unreasonable application of, controlling Supreme Court law. *Id*.

The OCCA found no merit in Petitioner's claim of ineffective assistance of counsel:

In Proposition IV, Appellant contends he was denied the effective assistance of counsel by counsel's failure to object to the errors raised in Propositions II and III of his appellate brief. We review Appellant's claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). In order to show that counsel was ineffective, Appellant must show both deficient performance and prejudice. *Goode v. State*,

2010 OK CR 10, ¶ 81, 236 P.3d 671, 686 *citing Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. *See also Marshall v. State*, 2010 OK CR 8, ¶ 61, 232 P.3d 467, 481. In *Strickland*, the Supreme Court said there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, *i.e.*, an appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Goode*, 2010 OK CR 10, ¶ 81, 236 P.3d at 686. To establish prejudice, Appellant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at ¶ 82, 236 P.3d at 686.

Appellant first asserts trial counsel was ineffective for failing to request instructions on lesser included offenses. In Proposition II, we addressed for plain error the trial court's failure to instruct the jury *sua sponte* on the lesser included offenses of first degree heat of passion manslaughter, first degree manslaughter by resisting criminal attempt and second degree depraved mind murder. We found no error and thus no plain error in the absence of the instructions as such instructions were not supported by the evidence. Counsel's failure to request the instructions or to object to their absence does not satisfy the requirements of *Strickland* because any such request or objection would have been overruled. *Mitchell v. State*, 2011 OK CR 26, ¶ 144, 270 P.3d 160, 191.

Appellant also contends trial counsel was ineffective for failing to object to improper character evidence as discussed in Proposition III. Reviewing for plain error, we found no prosecutorial misconduct in the prosecutor's comments on Appellant's lack of remorse. Under the facts of this case, the prosecutor's comments were relevant and properly allowed. Any objection by the defense would have been overruled. We will not find counsel ineffective for failing to raise an objection which would have been overruled. *Rutan v. State*, 2009 OK CR 3, ¶ 81, 202 P.3d 839, 855-56; *Frederick v. State*, 2001 OK CR 34, ¶ 189, 37 P.3d 908, 955.

We also found no plain error in the trial court's failure to redact further Appellant's recorded interviews with police. The majority of the material on the recorded interviews was relevant and probative of Appellant's guilt or innocence. Agent Beaver's questioning was consistent with his description of his interrogation techniques. Any request to further redact the interviews or objections to the failure to do so would have been overruled. Therefore Appellant has failed to show that counsel's performance was deficient or that he was prejudiced thereby. *Mitchell*, 2011 OK CR 26, ¶ 144, 270 P.3d at 191.

Having reviewed the allegations of ineffectiveness raised by Appellant, and considering counsel's challenged conduct on the facts of the case as viewed at the time of trial, we find Appellant has failed to meet his burden of showing a reasonable probability that, but for any professional errors by counsel, the result of the trial would have been different as any errors or omissions by counsel did not influence the jury's determination of guilt or sentencing. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

*Williams*, slip op. at 24-26.  [Doc. 9-4 at 24-26].

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. To prevail on his claim of ineffective assistance of counsel, the defendant must prove deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficiency, the defendant must overcome the strong presumption that counsel's conduct fell within the wide range of professional conduct, including trial strategy.  *Id*. at 689.  To prove prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.

The Supreme Court has provided additional guidance regarding the application of *Strickland* in habeas corpus proceedings:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Williams v. Taylor*, 529 U.S. 362, 410 (2000).  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (emphasis in original).  The Court further explained:

> Surmounting *Strickland's* high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

32

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted). *See also Hooks v. Workman*, 689 F.3d 1148, 1187 (10th Cir. 2012).

The OCCA reviewed the record in the case at hand and correctly applied *Strickland* to Petitioner's ineffective-assistance claim. Petitioner is convinced that his trial counsel was ineffective for failing to request lesser offense instructions and failing to object to improper and irrelevant character evidence. But, as noted by Respondent, counsel's conduct cannot be deemed deficient or prejudicial to Petitioner because "any requests for the instructions or objections to the admission of evidence by defense counsel would have been overruled." [Doc. 9 at 50]. Defense counsel is not ineffective for failing to raise issues that are meritless. *See Sperry v. McKune*, 445 F.3d 1268, 1275 (10th Cir. 2006) (holding that counsel was not ineffective for failing to assert a meritless argument at trial); *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004) (observing that "if the issue is meritless, its omission will not constitute deficient performance."). Nor has Petitioner demonstrated a reasonable probability of a different outcome but for trial counsel's failure to raise these claims. The other evidence at trial (i.e., the number of bullet wounds, the manner in which the unarmed victim was killed, Petitioner's statements to his friends/family) was strong and clearly supported a first degree murder conviction.

After careful review, the court finds the OCCA's determination of Petitioner's ineffective assistance of counsel claim was not based on an unreasonable determination of the facts, and the decision was not contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d). Ground IV is denied.

**Ground V:   The accumulation of errors deprived Petitioner of a fair trial and reliable verdict.**

In his final claim, Petitioner alleges the accumulation of errors deprived him of a fair trial. [Doc. 1 at 6].  The OCCA found no merit in this claim:

> In Proposition V, Appellant argues that even if none of the previously discussed allegations of error, when viewed in isolation, necessitate reversal of his convictions, the combined effect of these errors deprived him of a fair trial and requires relief. This Court has held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Engles v. State*, 2015 OK CR 17, ¶ 13, 366 P.3d 311, 315; *Lott v. State*, 2004 OK CR 27, ¶ 166, 98 P.3d 318, 357. As we have found no error, there is no accumulation of errors. This proposition is denied.

*Williams*, slip op. at 26.  [Doc. 9-4 at 26].

The Tenth Circuit recently provided the following guidance for analyzing cumulative-error claims:

> "In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cole v. Trammell*, 755 F.3d 1142, 1177 (10th Cir. 2014) (quoting *Alverson v. Workman*, 595 F.3d 1142, 1162 (10th Cir. 2010)). "The cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Smith*, 824 F.3d at 1255 (quoting *United States v. Franklin-El*, 555 F.3d 1115, 1128 (10th Cir. 2009)). To receive habeas relief, [petitioner] must show that "the cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hanson*, 797 F.3d at 852 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

*Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 915 (10th Cir. 2019) (footnote omitted).

The court finds there were no constitutional errors to aggregate in this action, meaning there is no basis for a cumulative error analysis.  Petitioner has failed to show that the OCCA's ruling on this claim was contrary to, or an unreasonable application of, clearly established federal law.  This ground for relief must be denied.

**Certificate of Appealability**

The court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2).   In addition, he has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Therefore, a certificate of appealability shall be denied.

ACCORDINGLY, Petitioner's petition for a writ of habeas corpus [Doc. 1] is DENIED, and a certificate of appealability is DENIED.

It is so ordered this 30th day of September, 2020.

_____
THE HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA